UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Annette Williams

     v.                                    Civil No. 25-cv-331-LM
                                            Opinion No. 2026 DNH 097 P
Social Security Administration,
Commissioner


# O R D E R

Plaintiff Annette Williams brings this action seeking judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for disability insurance benefits and supplemental security income benefits under the Social Security Act. Williams moves to reverse the Commissioner's decision (doc. no. 7), and the Commissioner moves to affirm (doc. no. 9). For the following reasons, the court reverses the Commissioner's decision.


## STANDARD OF REVIEW

In reviewing the final decision of the Commissioner under 42 U.S.C. § 405(g), the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Sacilowski v. Saul, 959 F.3d 431, 437 (1st Cir. 2020). The court defers to the ALJ's factual findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016). "Substantial-evidence review is more deferential than it might

sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (quotation omitted). Rather, the court "must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [his] conclusion." Id. (quotation and alterations omitted).

**DISABILITY ANALYSIS FRAMEWORK**

The Social Security Administration's regulations set out a five-step, sequential process that ALJs must follow to evaluate whether a person is "disabled" under the Social Security Act—that is, unable to engage in any "substantial gainful activity." See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520. The five steps are as follows:

- **Step One**: If the claimant is presently engaging in substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). If the claimant is not engaging in substantial gainful activity, the ALJ proceeds to the second step. Id. § 404.1520(a)(4).

- **Step Two**: If the claimant does not have any impairment or any combination of impairments that significantly limits her physical or mental ability to do basic work activities, she is not disabled because she lacks a "severe" impairment. Id. § 404.1520(c). If the claimant has a severe impairment or combination of impairments, the ALJ proceeds to the third step. Id. § 404.1520(a)(4).

- **Step Three**: If any of the claimant's impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled—and the ALJ need not proceed to steps four and five. Id. § 404.1520(d). If the claimant's impairments do not meet

or equal the listed impairments, the ALJ proceeds to the fourth step. Id. § 404.1520(a)(4).

- **Step Four**: If the claimant's impairments do not prevent her from doing her past relevant work, then she is not disabled. Id. § 404.1520(e)-(f). If the claimant is unable to do her past relevant work, the ALJ proceeds to the fifth step. Id. § 404.1520(a)(4).

- **Step Five**: If the claimant's impairments do not prevent her from doing other work that exists in the national economy, then she is not disabled. Id. § 404.1520(g). If the claimant is not able to do other work, then she is disabled. Id. § 404.1520(a)(4).

At steps one through four, the claimant has the burden of proof. Sacilowski, 959 F.3d at 433-34. At step five, however, the Commissioner has the burden of proof. Id.

If the claimant meets her burden at the first two steps of the sequential analysis, but not at the third, the ALJ proceeds to steps four and five, which begin with a determination of the claimant's "residual functional capacity," i.e., a determination of what kinds of things the claimant can and cannot do, mentally and physically. See 20 C.F.R. § 404.1545(a)(1). A person's residual functional capacity is an assessment of "the most" the claimant can do despite her limitations. Id. After the ALJ determines the claimant's residual functional capacity, the ALJ compares that assessment against the demands of the claimant's past work (at step four) and against other jobs that exist in the national economy (at step five). Id. § 404.1520(e)-(g). If the claimant's residual functional capacity allows her to perform her past relevant work or work that exists in the national economy, the claimant is not disabled. See id. § 404.1520(a)(4)(iv)-(v), (e), (f).

**BACKGROUND**[1]

Williams applied for disability benefits in November 2022 and claimed that she became disabled on October 24, 2022.[2] Williams alleged impairments including diverticulosis, hiatal hernia, two skin diseases (Darier disease and hidradenitis suppurativa), high cholesterol, and vocal cord dysfunction. The Social Security Administration denied Williams's application, and she timely requested reconsideration. The Social Security Administration upheld the denial, and Williams requested a hearing before an ALJ. The ALJ held a hearing in August 2024.

During the hearing, Williams and a vocational expert testified. Williams was fifty-nine years old at the time of the hearing. Prior to stopping work in 2022, Williams worked as a cashier at Walmart, where she lifted up to approximately twenty-five to thirty pounds. Williams testified that she is "constantly in and out of the bathroom with bowel issues," and that she had a "neuro-endocrine tumor" in her small intestine. Administrative Record (AR) at 42-43. Williams explained that doctors attempted to remove the tumor in March 2024, but that she experienced acute respiratory failure during the procedure, forcing the doctors to abandon their efforts. Williams testified that she experiences both "frequent diarrhea" and the need to defecate four to five times per day. Id. at 43. While Williams's gastrointestinal problems began at the end of 2021, Williams stated that "over the

---

[1] The court recounts only the facts of Williams's medical record that are needed to resolve her claim regarding her diverticulosis.

[2] Williams's date last insured is December 31, 2026.

last year it's gotten worse." Id. Williams also explained that she suffers from two chronic skin conditions that cause such painful rashes and lesions that she has trouble both standing and walking, and that if she does either of those activities for too long, her legs start to go numb. Williams estimated that she can only stand for "ten minutes at most." Id. at 51. Williams also testified that she suffers from ongoing chronic obstructive pulmonary disease (COPD), and uses a maintenance inhaler daily, and an albuterol inhaler as needed.

Regarding daily activities, Williams testified that she has no issues with self-care, personal hygiene, or dressing, but that her sister assists with grocery shopping. Williams stated that she spends most of her time lying in bed watching television, getting up primarily to use the restroom or to prepare a meal using her microwave.

During the hearing, the vocational expert classified Williams's past work as a retail cashier/stocker as "light but performed as medium." Id. at 53. The ALJ then asked the vocational expert to assume a hypothetical person of Williams's age and education who was limited to work at a light exertional level, who could frequently climb ladders, ropes and scaffolds, speak publicly and use the telephone, and who needed to avoid concentrated exposure to unprotected heights, moving mechanical parts, and wetness. When asked whether this hypothetical individual could perform Williams's past work, the vocational expert explained that the hypothetical person could perform that work "as classified." Id. at 54. Moreover, the vocational expert testified that if the hypothetical individual needed to be off task more than 15% of

the workday based on their physical or mental symptoms, that would be "work preclusive." Id. at 55.

In addition to the medical record, the evidence before the ALJ included an opinion from Williams's treating providers, Dr. Scott LeBlanc and APRN Anna Murphy, and opinions from Drs. Corbier and Gruenwald, the state agency consultants who reviewed the medical record. Williams also submitted medical records that post-dated all three medical opinions.

I.    Williams's Gastrointestinal Issues and March 2024 Hospitalization

In October 2020, Williams underwent a colonoscopy where doctors observed over ten polyps and diverticulosis, in addition to other findings. In June 2023, Williams had another colonoscopy where doctors removed "[t]wo diminutive colon polyps," and again noted her diverticulosis. Id. at 723. At a follow-up visit on December 12, 2023, Williams presented with "intense heartburn with vomiting" and a "cramping discomfort" starting in "her lower abdomen leading all the way up to her chest and through to her back." Id. at 870. Williams explained that the polyp removal during her June 2023 colonoscopy made her "lower GI symptoms" feel better, and that her bowel movements were "back to her baseline which fluctuate in stool consistency." Id. She also reported, however, that she "still feels as though she is having incomplete emptying with daily bowel movements as well as diffuse lower abdominal discomfort." Id.

On March 1, 2024, after all the physicians in this case had submitted their opinions, Williams visited her gastroenterology provider and reported that she

experienced vomiting in her sleep, "fecal frequency," and abdominal cramping. Id. at 994-95. She denied having a decreased appetite, acholic stools, or experiencing unintentional weight loss. At that visit, the treating physician's assistant (PA) observed that Williams's abdomen was not tender, distended, did not reveal any masses when palpated, and exhibited positive bowel sounds. The PA recommended that Williams undergo an endoscopy and follow up with her local gastroenterologist for a colonoscopy.

Several weeks later, on March 22, Williams's follow-up endoscopy revealed "[d]iffuse severe inflammation" and "shallow ulcerations" throughout the entire duodenum. Id. at 960. The doctor that performed the procedure noted that the "ulcerations extended as far as the gastroscope would reach," and explained that he had a "[s]trong suspicion for gastrinoma," a type of neuroendocrine tumor.[3] Id. at 974. Given this concern, the doctor recommended that Williams undergo additional testing and abdominal imaging. Id.

Notably, the doctor was unable to complete Williams's endoscopy because she developed "acute hypoxic respiratory failure" during the procedure, which the doctor attributed to "[a]spiration of gastric contents." Id. at 965. Williams was intubated and admitted to the hospital, and her hypoxia resolved overnight. Williams denied

---

[3] Gastrinoma is a "tumor that causes overproduction of gastric acid. It usually begins in the duodenum (first part of the small intestine that connects to the stomach) or the islet cells of the pancreas. . . . It is a type of neuroendocrine tumor, and it may metastasize (spread) to the liver and the lymph nodes." Gastrinoma, Nat'l Cancer Inst. Dictionary of Cancer Terms, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/gastrinoma (last visited July 16, 2026).

experiencing abdominal pain, nausea, or diarrhea while in the hospital. Williams's discharge order directed her to resume normal activity "as tolerated" and to maintain a "[n]ormal diet." Id. at 968.

## II.    Dr. LeBlanc and APRN Murphy's Opinion

In determining Williams's residual functional capacity, the ALJ considered the opinion of Williams's treating internal medicine providers, Dr. LeBlanc and APRN Murphy.[4] On February 1, 2023, Williams's providers filled out a "medical source statement" form, which described Williams's functional limitations. Id. at 832. Williams's providers diagnosed her with a vocal cord lesion, shortness of breath, hoarseness, cough, and Darier's Disease. Using the form's checkboxes, Williams's providers indicated that Williams was only able to stand or walk for up to two hours during an eight-hour workday, but that she could sit for up to eight hours. Williams's providers further noted that Williams could never lift weight, twist, stoop, crouch, or climb stairs. Williams's providers further indicated that Williams could never use her arms to reach objects,[5] and that her impairments would cause her to be absent from work for more than four days per month. Williams's providers described her "pain or other symptoms" as "severe enough to

---

[4] The form upon which this opinion is rendered appears to have been completed by APRN Murphy and is signed by both her and Dr. LeBlanc. The court therefore considers it the opinion of both providers and describes them jointly as "Williams's providers."

[5] Williams's providers' opinion does not explain why Williams is limited in this way, but the record contains evidence that Williams suffers from painful skin conditions.

[frequently] interfere with attention and concentration needed to perform even simple work tasks." Id. at 834.

III.    State Agency Consultant Opinions

Two state-agency consultants, Drs. Cordier and Gruenwald, reviewed Williams's medical records and gave their opinions of her ability to work.

A.    Dr. Corbier

Dr. Corbier issued an opinion on September 19, 2023. Dr. Corbier stated that Williams had several medically determinable impairments, including COPD, obesity, and "Disorders of Muscle, Ligament, and Fascia." Id. at 63. He determined that all impairments were "[s]evere." Id. Dr. Corbier indicated, however, that he believed that Williams's "statements about the intensity, persistence, and functionally limiting effects of [her] symptoms" were not "substantiated by the objective medical evidence alone." Id. He explained that Williams's reported symptom-related limitations were "partially consistent" with the medical evidence in the file, "[but] not to the degree reported." Id.

With respect to Williams's residual functional capacity, Dr. Corbier determined that Williams had some exertional limitations: she could only occasionally lift or carry up to twenty pounds and could only stand and/or walk for about six hours in an eight-hour workday. Williams could similarly only sit for about six hours in an eight-hour workday. Dr. Corbier indicated that Williams had only mild postural limitations, indicating that Williams had no limits on her ability to climb ramps, balance, stoop, kneel, crouch, and crawl, and that she could climb

9

ladders, ropes, and scaffolds "frequently." Id. at 64. Dr. Corbier found that Williams had to limit her speaking and "[a]void concentrated exposure" to wetness, fumes, odors, dusts, gases, poor ventilation, and hazards. Id. at 65.

Dr. Corbier ultimately concluded based on the documented findings that Williams was not disabled. He further noted that Williams had the residual function capacity to perform her past relevant work experience as a cashier.

B.    Dr. Gruenwald

Dr. Gruenwald issued an opinion on February 15, 2024, after Williams requested reconsideration of the initial denial of her application. Considering the medical evidence that was before Dr. Corbier, in addition to new records produced after Dr. Corbier's initial opinion, Dr. Gruenwald essentially adopted all the findings in Dr. Corbier's evaluation. Dr. Gruenwald observed that Williams suffered from diverticulosis and had had two colon polyps removed, and that this procedure improved her symptoms. Dr. Gruenwald determined that Williams was not disabled and had a residual functional capacity that allowed her to perform her past work as a cashier.

IV.    The ALJ's Unfavorable Decision

The ALJ issued an unfavorable decision on February 18, 2025. The ALJ found that Williams was not disabled from October 24, 2022, through the date of the ALJ's decision. At step one, the ALJ found that Williams had not engaged in substantial gainful activity since the date of her claimed disability, October 24, 2022. At step two, the ALJ found that several of Williams's impairments were

10

"severe," including COPD, obesity, hidradenitis suppurativa, Darier's Disease, diabetes, diverticulosis, vocal polyps, and lower thoracic osteophytosis.[6] Id. at 20. But, at step three, the ALJ found that Williams's impairments were not of the kind listed in Appendix 1 that automatically qualify a person as disabled. Accordingly, the ALJ moved to steps four and five.

The ALJ found that, considering her impairments, Williams had the residual functional capacity to perform light work, and that she could climb ladders, ropes, and scaffolds frequently. The ALJ found that Williams could also frequently speak publicly and on the phone, but that she must avoid concentrated exposure to unprotected heights, moving mechanical parts, and wetness.

Although the ALJ found that Williams's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms," he concluded that her statements concerning the "intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record." Id. at 22. The ALJ did not find credible Williams's testimony that she was unable to work because her gastrointestinal issues caused her to have bowel movements up to four to five times per day. The ALJ concluded that "the evidence does not support the limitations as alleged." Id.

The ALJ conceded that a June 12, 2023 colonoscopy revealed that Williams suffered from diverticulosis. The ALJ noted, however, that Williams later reported

---

[6] The ALJ found that Williams's other alleged impairments—hiatal hernia, gastroesophageal reflux disease (GERD), and anxiety and depression—were either "non-severe" or "non-medically determinable." AR at 20.

11

that her lower gastrointestinal symptoms improved after some polyps were removed during the colonoscopy. Importantly, the ALJ also relied on newer medical records from March 2024—that had not been evaluated by any medical professional—to support his conclusion that Williams's limitations were not as severe as she claimed. The ALJ conceded that Williams reported fecal frequency on March 1, 2024, but he underscored that she denied having a decreased appetite, unintentional weight loss, or acholic stools, and that physical examinations showed that Williams did not exhibit abdominal tenderness or distention. Moreover, the ALJ reviewed Williams's medical records from March 22-23 and conceded that Williams underwent an endoscopy and was hospitalized after she experienced respiratory failure, which prevented doctors from completing the procedure. The ALJ noted, however, that Williams denied abdominal pain, nausea, or diarrhea throughout her hospitalization, and that she was discharged with "self-care measures." Id. at 24. The ALJ did not discuss the part of the records from the March 2024 hospitalization in which the treating doctor noted that Williams likely had a neuroendocrine tumor that required additional testing and analysis.

The ALJ also relied on the opinions of Drs. Corbier and Gruenwald who, having issued their respective opinions in September 2023 and February 2024, did not have the opportunity to review the full range of medical evidence relating to Williams's gastrointestinal issues in March 2024. Not privy to this information, neither physician included any limitations for frequent bathroom breaks in their assessments of Williams's residual functional capacity. Nevertheless, the ALJ found

12

that the consulting physicians' opinions "were consistent [with] the medical evidence in the record namely . . . gastrointestinal functioning with continued treatment."[7] Id. at 25.

While the ALJ agreed that Williams has certain physical conditions that result in limitations on her ability to function, he concluded that Williams overstated the "severity" of her symptoms. Id. at 26. The ALJ explained that his conclusions regarding Williams's residual functional capacity address her complaints only to the extent he found them supported by the evidence. Id.

After determining Williams's residual functional capacity, the ALJ found at step four that Williams was able to do her past work as a cashier "as generally performed." Id. The ALJ noted that the vocational expert testified about how Williams's "occupation is currently performed and that its requirements are consistent with the limitations contained" in the ALJ's assessment of Williams's residual functional capacity.[8] Id. Accordingly, the ALJ found at step four that Williams was not disabled.[9] See 20 C.F.R. § 404.1520(f).

---

[7] The ALJ found Williams's providers' opinion "less persuasive" because it was not supported by citations to the record and was inconsistent with the medical evidence as it contained "limitations [that] were far too extreme." AR at 25.

[8] The hypothetical question that the ALJ posed to the vocational expert matched the ALJ's adopted residual functional capacity.

[9] The ALJ did not proceed to step five to determine whether Williams's impairments prevented her from doing other work that exists in the national economy.

**DISCUSSION**

Williams argues that: (1) the ALJ failed to address the functional effects of Williams's severe diverticulosis in his residual functional capacity assessment; (2) the ALJ's evaluation of Williams's treating providers' medical opinion failed to satisfy the requirements of 20 C.F.R. § 404.1520c; and (3) the ALJ's residual functional capacity assessment omitted certain limitations related to COPD "without explanation." Because the court finds that the ALJ erred in assessing the effects of Williams's diverticulosis, it does not reach Williams's remaining claims.

I.      The ALJ Improperly Discounted the Effects of Williams's Diverticulosis

Williams argues that the ALJ's assessment of her residual functional capacity is not supported by substantial evidence because the ALJ discounted the severity of her worsening diverticulosis, including her reported diarrhea, fecal frequency, and the related need for frequent bathroom breaks. She contends that the ALJ erred in relying on the opinions of the consulting physicians who did not have the opportunity to review her March 2024 medical records and that the ALJ, as a lay person, was "not qualified to interpret functional capacity from raw medical data." Doc. no. 7-2 at 14 (quoting Natarelli v. O'Malley, Civ. No. 23-cv-542-SM-AJ, 2024 WL 2060835, at *3 (D.N.H. Apr. 22, 2024), R&R approved sub nom. Natarelli v. US Soc. Sec. Admin., Acting Comm'r, 2024 WL 2050606 (D.N.H. May 8, 2024)). The court agrees.

"In evaluating a claimant's symptoms, the ALJ first 'considers whether there is an underlying medically determinable physical or mental impairment(s) that

could reasonably be expected to produce' those symptoms, and then 'evaluates the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.'" Ortiz v. Dudek,, Civ. No. 24-cv-11704-ADB, 2025 WL 1400356, at *29 (D. Mass. May 14, 2025) (brackets omitted) (quoting Stafford v. Saul, 564 F. Supp. 3d 1, 7 (D.N.H. 2020)). When evaluating a claimant's statements regarding the intensity, persistence and limiting effects of subjective symptoms, ALJs must "consider the entire case record, including the objective medical evidence, the individual's statements, statements and other information provided by medical sources and other persons, and any other relevant evidence, as well as whether the subjective statements are consistent with the medical signs and laboratory findings." Robert L. v. Bisignano, No. CV 25-335-PAS, 2026 WL 472843, at *4 (D.R.I. Feb. 19, 2026) (citing SSR 16-3p, 2017 WL 5180304, at *2-6 (Oct. 25, 2017)). The First Circuit has held that "in the absence of evidence that directly rebuts the claimant's testimony or presents some other reason to question its credibility, the ALJ must take the claimant's statements as true." Denise D. v. O'Malley, No. CV 23-233-PAS, 2024 WL 3329473, at *8 (D.R.I. July 8, 2024) (citing Sacilowski, 959 F.3d at 441); see, e.g., id. at 10 (error for ALJ to reject claimant's subjective descriptions of symptoms based on contrary testimony of medical expert who was not privy to parts of medical record that supported claimed limitation).

Moreover, "[a]s a general rule, 'if the state agency consultant reviewed only part of the record, the opinion cannot provide substantial evidence to support the

15

ALJ's residual functional capacity assessment if later evidence supports the claimant's limitations.'" Stafford, 564 F. Supp. 3d at 8 (brackets omitted) (quoting Ledoux v. Acting Comm'r, Soc. Sec. Admin., Civ. No. 17-cv-707-JD, 2018 WL 2932732, at *4 (D.N.H. June 12, 2018)). Similarly, remand may be required where an ALJ relies on the findings of non-examining consulting physicians who did not address an alleged limitation because "they did not see records establishing the sheer scope of claimant's many medical concerns." Denise D., 2024 WL 3329473, at *8.

Here, the ALJ erred by relying on the reports of two consulting physicians who did not have the opportunity to review Williams's March 2024 medical records which show her diverticulosis progressing. The Commissioner argues that the ALJ permissibly relied on these reports because at least one consulting physician, Dr. Gruenwald, reviewed medical records relating to Williams's diverticulosis as late as December 2023, and that his assessment of Williams's residual functional capacity did not include any limitations for frequent bathroom breaks.[10] Moreover, the Commissioner argues that the March 2024 records do not support Williams's testimony regarding her fecal frequency.

While it is true that Dr. Gruenwald reviewed records relating to Williams's June 2023 colonoscopy and her December 2023 follow-up visit (at which she reported that her gastrointestinal symptoms improved somewhat after the doctors removed several polyps), notes from Williams's March 1, 2024 office visit support

---

[10] Dr. Gruenwald issued his opinion on February 15, 2024.

16

Williams's assertion that her condition, including fecal frequency, was worsening. Specifically, on March 1, Williams reported to a treating PA that, among other things, she experienced vomiting, fecal frequency, and abdominal cramping. Based on Williams's presentation, the PA scheduled an endoscopy for later that month and advised Williams to follow up with another colonoscopy. Williams's follow-up endoscopy on March 22 revealed "[d]iffuse severe inflammation" and "shallow ulcerations" throughout the entire duodenum. AR at 960. The "ulcerations extended as far as the gastroscope would reach," and caused the doctor to develop a "[s]trong suspicion for gastrinoma," such that he recommended additional testing and imaging. Id. at 973-74. As the records show, the doctor was forced to abandon the procedure because Williams experienced acute respiratory failure.

These findings, in addition to Williams's documented complaint of fecal frequency, all appear in reports that the consulting physicians did not have the opportunity to review. They support Williams's hearing testimony regarding her gastrointestinal issues, her need for frequent bathroom breaks, and her assertion that her condition was progressively getting worse. Accordingly, it was error for the ALJ to rely on the consulting physicians' opinions to support his finding that Williams's claimed diarrhea and fecal frequency were not as severe as she alleged. See Denise D., 2024 WL 3329473, at *10 (remand required where ALJ discounted claimant's testimony regarding symptoms by relying on medical experts who based their opinions on a "materially incomplete record").

17

What is more, there is no evidence that the consulting physicians even considered what effect Williams's diverticulosis and alleged need for frequent bathroom breaks would have on her ability to stay on task during the workday. Perhaps because the consulting physicians only had access to the stale December 2023 records (where Williams reported that her colonoscopy made her feel somewhat better), the reports offer no opinion on the severity of Williams's diarrhea, nor the number of times Williams must use the restroom. This silence is another reason the ALJ erred in relying on the consulting physicians' opinions to discredit Williams's testimony. Cf. Sacilowski, 959 F.3d at 439 (ALJ could not rely on opinions of state agency physicians to rebut evidence that claimant would be absent from work due to disability where "there is no indication in the record that the state agency physicians were ever asked to even consider [claimants'] impairments' impact on absences"); Jessica S. v. Kijakazi, C.A. No. 21-75MSM, 2022 WL 522561, at *4-6 (D.R.I. Feb. 22, 2022) (non-examining experts "did not have access to a sufficiently developed record to permit them even to consider how the total number of medical appointments and hospitalizations would impact work attendance"), R&R adopted, 2022 WL 834019 (D.R.I. Mar. 21, 2022)).

The Commissioner also argues that there was insufficient evidence to corroborate Williams's testimony regarding her gastrointestinal symptoms. However, the First Circuit has held that in the absence of direct evidence to rebut a claimant's testimony about subjective symptoms or reason to question its credibility, such statements should be taken as true. Sacilowski, 959 F.3d at 441;

18

see id. (error for ALJ to disregard claimant's "own allegations as not enough to establish disability," where there was no evidence to directly rebut claimant's testimony nor any reason to question its credibility (brackets and quotation omitted)).

Citing various parts of the record from 2022 and 2023, the Commissioner attempts to downplay the severity of Williams's diverticulosis. For example, the Commissioner highlights that in June 2023, doctors identified only "[a] few small diverticula" during Williams's colonoscopy, and that in December 2023, Williams reported that she felt better after this procedure. Doc. no. 9 at 9 (quoting AR at 23). The Commissioner also points to records from two of Williams's medical appointments (in 2022 and 2023) where she denied experiencing a change in bowel habits, constipation, or diarrhea.

Like the consulting physicians' opinions, however, the Commissioner relies solely on records from before Williams's condition progressed in 2024.[11] And, the Commissioner fails to identify any evidence directly contradicting Williams's testimony. The fact that Williams twice reported that she was not experiencing diarrhea or that she felt somewhat better at one point in December 2023 does not provide reason to doubt her testimony regarding the symptoms she experienced over the entire three-year period. Cf. Sacilowski, 959 F.3d at 439 ("record contain[ed] no evidence to directly contradict [claimant's] testimony about her

---

[11] Williams testified in 2024 that her gastrointestinal symptoms began in late 2021 but progressively worsened over time.

19

ailments and their frequency and severity," even where Commissioner cited several doctors' reports indicating that Botox injections had reduced the frequency of her migraines at various times over the relevant period).

To the extent that the Commissioner argues that the ALJ properly determined that Williams's 2024 hospital records contradict her accounts of diarrhea and fecal frequency, this argument fails too. While an ALJ, as a lay person, "may make findings about functional capacity based on common sense in circumstances within a lay-person's competence," he "is not qualified to interpret functional capacity from raw medical data." Natarelli, 2024 WL 2060835, at *3. The ALJ discounted Williams's reports regarding her March 2024 hospitalization and gastrointestinal symptoms based on his own review of the record. The ALJ gave weight to the fact that Williams denied abdominal pain, nausea, or diarrhea during her March 22-23, 2024, hospitalization. The ALJ did not explain, however, how Williams's failure to exhibit or report these signs and symptoms in late March 2024 contradict Williams's testimony regarding her fecal frequency, which she reported to her treating provider just three weeks before her hospitalization.[12] In any event, the ALJ exceeded the scope of his authority in drawing this conclusion based on his own interpretation of the raw medical data. Natarelli, 2024 WL 2060835, at *3; cf.

---

[12] While Williams did deny experiencing diarrhea during her less-than-two-day hospital stay in March 2024, this does not amount to evidence contradicting her testimony that she experienced fecal frequency, and it says little if anything about whether she experienced diarrhea outside of this brief window when she was in the hospital. See Sacilowski, 959 F.3d at 439.

Rodríguez Feliciano v. Comm'r of Soc. Sec., No. CV 19-1095 (MEL), 2022 WL 3643949, at *7 (D.P.R. Aug. 24, 2022) (where claimant had hand surgery after consulting physicians issued reports, ALJ erred in interpreting records from surgery to discount claimant's testimony that she experienced pain and could not use her hands).

Finally, the court is troubled that the ALJ did not in any way grapple with the fact Williams's doctor developed a "[s]trong suspicion" that Williams suffered from a neuroendocrine tumor in her small intestine (as she testified to before the ALJ) while performing the aborted endoscopy in March 2024. AR at 974. While it is not clear to the court from the record before it to what degree this suspected neuroendocrine tumor may be connected to Williams's diverticulosis or other gastrointestinal issues, it was incumbent upon the ALJ to develop the record on this material issue rather than ignore it. See Rodriguez v. Bisignaro, No. 24-CV-11946-DLC, 2025 WL 3089209, at *4 (D. Mass. Sept. 30, 2025), appeal dismissed sub nom. Rodriguez v. Bisignano, No. 25-1987, 2026 WL 1133152 (1st Cir. Apr. 8, 2026) (explaining that ALJs have a duty to develop the record in the event of ambiguity by, for example, seeking additional evidence or clarification).

For all these reasons, the ALJ erroneously discounted Williams's testimony regarding her diverticulosis. As a result, his residual functional capacity assessment is flawed. On remand, the ALJ must consider the impact of Williams's diverticulosis on her residual functional capacity, including the frequency and

duration of her required bathroom breaks.[13]  The ALJ must develop the record as appropriate, and allow Williams to present additional evidence and testimony so that the ALJ may meaningfully consider the issue, including "the combined effect of all . . . impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" to meet the definition of disability. Sacilowski, 959 F.3d at 440 (alteration in original) (quoting Stephenson v. Halter, No. Civ. 00-391-M, 2001 WL 951580, at *2 (D.N.H. Aug. 20, 2001)). In so doing, the ALJ should consult with both medical and vocational experts.

II.    <u>The Court Need Not Reach Williams's Remaining Claims of Error</u>

Williams also argues that the ALJ failed to properly analyze her treating providers' medical opinion under the requirements of 20 C.F.R. § 404.1520c. This regulation requires ALJs to evaluate medical opinions based on consistency with evidence from other sources, and to consider the opinion in light of "new evidence . . . receive[d] after the medical source made his or her medical opinion," among other criteria. Id. § 404.1520c(c). Because additional testimony and evidence submitted on remand will be relevant to the ALJ's analysis of the treating providers' opinion, the court declines to reach this issue. Similarly, the court need not address Williams's contention that the ALJ's residual functional capacity assessment omitted certain environmental limitations related to Williams's COPD. On remand, the ALJ will have the opportunity to correct this omission, which the

---

[13] As noted, the vocational expert testified that being off task for 15% of the workday would be work preclusive.

Commissioner acknowledges was error (though the Commissioner argues the error was harmless).

## CONCLUSION

For the foregoing reasons, Williams's motion to reverse (doc. no. 7) is granted, and the Commissioner's motion to affirm (doc. no. 9) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is remanded to the ALJ for further proceedings consistent with this order. The clerk of court is respectfully requested to enter judgment and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 21, 2026

cc:     Counsel of Record